**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
**Alex Meggitt**, OSB #174131
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**John Schlosser**, OSB #104959
John E Schlosser Attorney LLC
748 SE 181st Ave
Portland, OR 97233

    Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| EVELYN BASSI,<br><br>Plaintiff,<br><br>v.<br><br>FOUR UNKNOWN NAMED AGENTS OF DEPARTMENT OF HOMELAND SECURITY, GABRIEL RUSSELL, ALLEN SCOTT JONES, MARK MORGAN, RICHARD CLINE, RUSSEL BURGER, ANDREW SMITH, and JOHN DOES 1-50,<br><br>Defendants. | Case No. 3:22-cv-00743<br><br>COMPLAINT<br><br>Civil Rights Action (*Bivens* Action)<br><br>JURY TRIAL DEMANDED |

    This is a lawsuit about the illegal abduction of Plaintiff Evelyn Bassi. Like thousands of Portlanders, Ms. Bassi marched in the streets demanding that American police departments, including the Portland Police Bureau, be held to account for taking the lives of Black Americans.

COMPLAINT
Page 1 of 16

In response, the then-President of the United States of America launched a terror campaign against Portlanders protesting in the streets. Defendants employed tactics like forced disappearances of protesters without probable cause to intimidate the public and chill free speech. On July 15, 2020, Plaintiff Bassi became a victim of this terror campaign, and she now files suit.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1343(a)(3), (4).

## VENUE

2. Venue is proper within the District of Oregon because all of the events giving rise to this claim occurred in this judicial district, and Plaintiff resides in this District. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County, Oregon.

## PARTIES

3. Evelyn Bassi, Plaintiff, is a citizen of the State of Oregon.

4. Defendants Four Unknown Named Agents of the Department of Homeland Security are the federal officers who illegally abducted Plaintiff on the night in question. Plaintiff does not know the names of these agents, and so sues them under fictious names. Upon information and belief, other litigants against federal officers whom engaged in similar conduct in Portland, Oregon, around the time of July 2020 have been unable to identify these officers. Plaintiff reserves the right to substitute proper names for these Defendants when identified.

5. Defendant Gabriel Russell was a Regional Director with the DHS Federal Protective Service Region 10. Defendant Russell was the Commander of the DHS Rapid Deployment Force

for Operation Diligent Valor. He was responsible for and exercised tactical direction and control over DHS Forces stationed in and/or deployed to Portland, Oregon, for Operation Diligent Valor.

6. Defendant Allen Scott Jones was the Deputy Director for Operations for DHS FPS Region 10 and was the Deputy Incident Commander of all DHS forces stationed in and/or deployed to Portland, Oregon, for Operation Diligent Valor.

7. Defendant Mark Morgan was the Acting Commissioner of CBP. On information and belief, Defendant Morgan authorized and oversaw the deployment of CBP's Border Patrol Tactical Unit (BORTAC), ostensibly designated with FPS authority under 40 U.S.C. § 1315 and deployed to Portland, Oregon, as part of Operation Diligent Valor.

8. Defendant Richard "Kris" Cline was the Deputy Director of FPS. On information and belief, Defendant Cline authorized and oversaw the deployment of FPS forces, including CBP and ICE forces ostensibly designated with FPS authority, to Portland, Oregon, as part of Operation Diligent Valor.

9. Defendant Russel Burger was the U.S. Marshal for the District of Oregon. Upon information and belief, Defendant Burger was responsible for and exercised tactical direction and control over all USMS forces stationed in or deployed to Portland, Oregon, for protection of the Hatfield Courthouse and nearby federal properties as part of Operation Diligent Valor.

10. Defendant Andrew Smith was employed by the USMS as the Assistant Director for the Tactical Operations Division and was responsible for and exercised tactical direction and control over USMS forces, including members of the USMS Special Operations Group (SOG) forces, stationed in or deployed to Portland, Oregon, as part of Operation Diligent Valor.

11. Defendants John Does 1 - 10 are the federal officers who personally participated in the illegal abduction of Plaintiff on the night in question. Upon information and belief, other litigants

against federal officers whom engaged in similar conduct in Portland, Oregon, around the time of July 2020 have been unable to identify these officers. Plaintiff reserves the right to substitute proper names for these Defendants when identified.

12. Defendants John Does 11 - 20 are supervisory officers of the Federal Protective Services. Upon information and belief, other litigants against federal officers whom engaged in similar conduct in Portland, Oregon, around the time of July 2020 have been unable to identify these officers. Plaintiff reserves the right to substitute proper names for these Defendants when identified.

13. Defendants John Does 21 through 30 are supervisory officers of U.S. Immigration and Customs Enforcement. Upon information and belief, other litigants against federal officers whom engaged in similar conduct in Portland, Oregon, around the time of July 2020 have been unable to identify these officers. Plaintiff reserves the right to substitute proper names for these Defendants when identified.

14. Defendants John Does 31 through 40 are supervisory officers of U.S. Customs and Border Protection. Upon information and belief, other litigants against federal officers whom engaged in similar conduct in Portland, Oregon, around the time of July 2020 have been unable to identify these officers. Plaintiff reserves the right to substitute proper names for these Defendants when identified.

15. Defendants John Does 41 through 50 are supervisory officers of U.S. Marshalls Office. Upon information and belief, other litigants against federal officers whom engaged in similar conduct in Portland, Oregon, around the time of July 2020 have been unable to identify these officers. Plaintiff reserves the right to substitute proper names for these Defendants when identified.

## FACTUAL ALLEGATIONS
## I. Introduction: Black Lives Matter.

16. The disproportionate and excessive use of force against Black people by police officers in the United States is a well-documented, systemic problem. It exists in every police department in this country, including the PPB and the various Federal police agencies.

17. For many years, advocates and activists have attempted, largely unsuccessfully, to get the City of Portland to address and reduce the Portland Police Bureau's disproportionate use of force, stops, searches, seizures, and arrests of Black people, Indigenous people, and people of color. Efforts to address the Portland Police Bureau's racial profiling dates back to the 1990s.[1] And yet, despite all the recommendations, implemented or more often, not, the Portland Police continued to engage in disproportionate targeting of Black people in stops, searches, seizures, and uses of force.

18. On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

19. For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest,

---

[1] https://www.portlandoregon.gov/police/article/32381

demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

20.    Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons, planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended facemasks and macing them, kettling whole groups of protesters only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of tear gas and impact weapons in a systemic effort to stop people from protesting police violence.

21.    Beginning on May 29, 2020, Portlanders began demonstrating *en masse* in the streets demanding justice for George Floyd and demanding an end to police violence. The Portland Police, like police departments throughout the country, met those demands with violence.

22.    These violent reprisals by the police only emboldened the resolve of the public to make their voices be heard, their actions count, and their government to provide redress.

## II. Federal Invasion

23.    On June 26, 2020, former President Donald J. Trump issued Executive Order 13933, "On Protecting American Monuments, Memorials, and Statues and Combatting Recent Criminal Violence," which resulted in the deployment of federal agents to Portland.

24.    Surrounding that deployment, the public messaging from Trump Administration was that Portland had not been tough enough on protesters, and the federal government was going to take charge and quell the protests. While countless injuries and several federal injunctions would

show that the Portland Police were using anything but a soft approach on protesters, the coming federal police incursion would further abuse an already battered public.

25. On or about July 1, 2020, unidentified federal agents in military fatigues emerged for the first time from the Hatfield Courthouse and used force against members of the public as if they were enemy combatants. In keeping with the former president's messaging, the federal deployment did not fail to provide visuals akin to a warzone. Images from the conflict were turned into campaign advertisements for the former President.

26. Rather than employing crowd control tactics with a focus on protecting federal property, federal agents and supervisors engaged in violence on a nightly basis by indiscriminately targeting and injuring nonviolent and non-resisting individuals using significant force and/or arrest without probable cause.

27. At all material times, "Operation Diligent Valor" was a coordinated effort between the Department of Homeland Security (DHS), by and through the Federal Protective Service (FPS), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP) (collectively, "DHS Forces"), working with the United States Marshals Services (USMS). DHS and USMS contributed supervisory staff ("Supervisory Defendants," including Defendants Russell, Jones, Morgan, Cline, Burger, Smith, and John Does 11-50) and subordinate patrol level staff ("Patrol Level Defendants John Does 1-10").

28. On August 20, 2020, United States District Judge Michael Simon issued a preliminary injunction *Index Newspapers, LLC v. City of Portland*, USDC Case No. 20-cv-1035-SI finding that the federal defendants had been targeting journalists and legal observers during the month of July 2020 with unnecessary and excessive force. Judge Simon found that, "the character of the recent past violations by the Federal Defendants in Portland is particularly egregious" and "the

Federal Defendants have not recognized the wrongful nature of their conduct but instead assert that they have only engaged in lawful conduct."[2] The Court further observed, "given the disdainful comments publicly made by the highest officials at the Federal Defendants with respect to journalists, legal observers, Plaintiffs, protesters and the City of Portland, the professional and personal characteristics of the Federal Defendants show that they are likely to be enabled or tempted to engage in future violations."[3]

29. Through the preliminary injunction, Judge Simon ordered, among other relief, that defendants, "their agents and employees, and all persons acting under their direction are enjoined from arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer . . . unless the Federal Defendants have probable cause to believe that such individual has committed a crime."

30. On October 9, 2020, the U.S. Court of Appeals for the Ninth Circuit denied the Federal Defendants' motion to stay Judge Simon's preliminary injunction, observing that, "[a]s of the time the preliminary injunction was entered, the district court found that the Federal Defendants had engaged in a pattern of conduct that had persisted for weeks and was ongoing," and that such pattern of misconduct was "shocking."[4]

> "The many peaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others. "[T]he proper response to potential and actual violence is for the government to ensure an adequate police presence … and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Collins v. Jordan*, 110 F.3d. 1363, 1373 (9th Cir. 1996) (internal citations omitted)."[5]

---

[2]   Opinion & Order Granting Preliminary Injunction, ECF 157 at 54.
[3]   *Id*. at 55.
[4]   977 F.3d at 826, 829.
[5]   *Id*. at 834.

COMPLAINT
Page 8 of 16

31. Upon information and belief, all Supervisory Defendants participated directly or in concert with one another in authorizing the arrests of individuals without probable cause.

32. On information and belief, USMS Supervisory and Patrol Level Defendants participated in the booking, illegal DNA sampling and data collection and detention of arrested protesters, including the incidents alleged herein by Plaintiff.

33. On information and belief, on a nightly basis throughout the month of July 2020, and including on the nights of Plaintiffs' arrests, Defendants Russell, Smith, Jones, and other Supervisory Defendants manned the "Incident Command Post" or "Emergency Operations Center" within the Hatfield Courthouse and observed live feed video of Patrol Level Defendants' use of excessive force and unlawful detention against peaceful protesters.[6]

34. On information and belief, on a nightly basis throughout the month of July 2020, Defendants Russell, Jones, Morgan, Cline, Burger, Smith and other John Doe Supervisory Defendants, or were informed of and knew in real time of the force used and the arrests made by Patrol Level Defendants and the other federal officers, or were informed within 24 hours of their occurrence through internal after-action reporting and/or through external sources such as news media, social media and twitter.

35. Upon information and belief, Supervisory Defendants were aware that Patrol Level Defendants lacked adequate training in mass arrests and crowd control but failed to take action to adequately train them.[7]

---

[6] Declaration of Gabriel Russell, ECF 101-5, *Index Newspapers v. City of Portland*, 3:20-cv-1035-SI (filed July 30, 2020).

[7] Sergio Olmos, Mike Baker and Zolan Kanno-Youngs, *Federal Officers Deployed in Portland Didn't Have Proper Training, D.H.S. Memo Said*, The New York Times (July 18, 2020) https://www.nytimes.com/2020/07/18/us/portland-protests.html

36.     Upon information and belief, no reports of illegal arrests by federal agents were made by any Supervisory Defendant or Patrol Level Defendant for acts occurring in Portland, Oregon, during July 2020.

37.     Upon information and belief, Supervisory Defendants did not take disciplinary action against any Patrol Level Defendant for any acts occurring in Portland, Oregon, during July 2020.[8]

### III. July 15, 2020: Evelyn Bassi's Abduction

38.     Plaintiff Evelyn Bassi is a lifelong Portland resident who began attending nightly protests in early June 2020. Plaintiff came to the public square outside of the Federal Courthouse in Downtown Portland, Oregon, in support of the Black Lives Matter movement. She arrived on or around 11:00 pm on July 14, 2020.

39.     When she arrived, she saw about 100 people outside of the Federal Courthouse. She walked around the square a couple dozen times observing the protests. As the night wound down around 1:55 a.m. on July 15, 2020, Plaintiff decided that she wanted to go home. She walked around to the outside of the Multnomah County Justice Center, which houses both the Portland Police Bureau and the Multnomah County Jail, at or around SW 2nd Ave. and SW Main St. She saw people drawing outlines of bodies with chalk on the sidewalk.

40.     A dark gray Dodge Grand Caravan with tinted windows pulled up next to Plaintiff and her friend. Unbeknownst to them, inside the van were four federal police officers.

41.     The van's front and side doors on the passenger side opened as it rolled to a stop.

---

[8]     Judge Simon O&O Granting PI, *Index*, ECF 157 at 54.

42. Plaintiff noticed that the people in the van were in camouflage fatigues with military gear attached to their uniforms, including sidearms. She threw her hands up and said, "We're leaving, we're leaving."

43. Plaintiff and her friend walked away from the van. Her friend began running. Plaintiff slowly backed up with her hands above her head, but the van kept following them. The van followed Plaintiff and her friend for half a block. After the van did not disengage, Plaintiff changed directions and ran back towards the Justice Center. Plaintiff believes the van backed up to pursue her.

44. After the van caught up to her, two officers from the van with "POLICE" patches across their chests approached Plaintiff. She turned to face them with her hands up. "I haven't done anything wrong," she repeated.



45. The agents held Plaintiff's arms behind her back. The officers gripped her arms forcefully and escorted her to the van. She was ordered to sit cross-legged on the floor of the vehicle—its

middle seats removed—with her hands on her helmet and her head down. They began to drive through downtown.

46. Given the outrageousness of these officers' conduct and their fatigues, Plaintiff had no idea whether these were truly law enforcement officers. They appeared to be soldiers in a warzone. This placed her in immediate apprehension that she was being put in a place beyond the protection of the law and the Constitution.

47. The agents never said who they were. She knew she was not free to leave. Plaintiff did not know if she was ever going to be seen again by her family and friends. She worried she would never see her son again.

48. An officer asked whether Plaintiff, whose helmet covered her hair, was blonde. "No," she said.

49. The van made frequent turns for five to ten minutes, until the agents stopped at a quiet intersection around SW Taylor St. and SW Broadway Ave. seven blocks from where Plaintiff had been picked up.

50. Following the Defendant officers' orders, Plaintiff climbed out and put her hands on the van's roof. An agent frisked her and asked her whether she had a laser pointer. She told him she did not. Plaintiff does not recall seeing anyone shining a laser at an officer that evening.

51. "You're being detained because you match the description of somebody who committed a federal crime against an officer," the agent said. The officers removed her helmet. "That's not him," an officer said. Bassi is a woman. On her hat, she had a pin of the transgender flag (light blue, pink, and white) and another pin with her pronouns, "She/Her."

52. An officer held up a grainy cellphone photo of the man they sought. It showed a person wearing a face covering and a gray bicycle helmet that bore no resemblance in size or shape to

Plaintiff's black construction helmet. The person also had visible blonde hair. Plaintiff is visibly a brunette.

53. An agent told Plaintiff she was free to go but left her with a warning: "You know, bro, we have cameras everywhere."

54. Plaintiff walked back to her car, where she cried, then went home.

55. Plaintiff spent the next week in a daze. When she got home, the trauma of the evening prevented her from sleeping or caring for her needs. She agonized over the details. She agonizes still. Her head ached. She threw up. Her body hurt from being in a forced stress position in the vehicle. She spent the next week like this.

56. A week passed and she still struggled to sleep and eat. She reached out to her therapist for help. After her abduction and seeing this therapist, Plaintiff received a diagnosis of acute Post-Traumatic Stress Disorder. She received medication from her doctor.

57. Plaintiff called in sick for work more regularly because of the trauma. She still struggles to sleep more than 3 hours a night. To this day, Plaintiff lives with the anguish of having been unlawfully abducted in the middle of a terror campaign lead by Defendants at the behest of the President of the United States.

58. As of the date of this filing, Plaintiff has mailed a Tort Claim Notice to the claims administrators for the relevant agencies for this matter. 28 U.S.C. § 2401(b). Plaintiff has not received a response from the claims administrators. 28 U.S.C. § 2675(a); 28 C.F.R. § 14.2(c).

### Claim 2: Fifth Amendment – Due Process – Individual Liability
### (*Bivens* Action)

59. The Due Process clause of the Fifth Amendment protects persons from being subjected to governmental arbitrariness that shocks the conscience or outrages a sense of decency.

60. In the month of July 2020, the United States Government engaged in a terror campaign against the people of Portland that resulted in the enforced disappearance of Plaintiff. This campaign authorized the use of vans in manner that heavily-insinuated kidnapping and enforced disappearances.

61. As Amnesty International explains, "Enforced disappearance is frequently used as a strategy to spread terror within society. The feeling of insecurity and fear it generates is not limited to the close relatives of the disappeared, but also affects communities and society as a whole."[9]

62. Enforced disappearance is a crime under international law.

63. Because of their conduct, Defendants violated Plaintiff's clearly established right to be free from deprivations of liberty without due process. This violation shocks the conscience and is outrageous not only under the laws of the United States but under the norms of international law.

64. The actions of Defendants, as described in this complaint, were embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. The use of kidnapper vans and unlawful detention were purposeful to sow terror and suppress protected speech conduct. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendants, in their individual capacities, in an amount sufficient to punish them and to deter others from like conduct.

65. This violation of Plaintiff's due process rights was the direct and proximate cause of her bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, and shock. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

///

---

[9] https://www.amnesty.org/en/what-we-do/enforced-disappearances/

### Claim 2: Fourth Amendment – Unlawful Seizure – Individual Liability
### (*Bivens* Action)

66. It is clearly established law that an officer may not seize a person, without reasonable suspicion to detain the person, or probable cause or a warrant to arrest them.

67. In taking the actions described above, including but not limited to purposefully directing Federal Officers to abduct Plaintiff without either reasonable suspicion or probable cause, in personally participating in the abduction of Plaintiff, and in improperly supervising the abduction of Plaintiff without either reasonable suspicion or probable cause, Defendants intentionally violated Plaintiff's right to be free from unlawful seizures, guaranteed by the Fourth Amendment to the United States Constitution.

68. The actions of Defendants, as described in this complaint, were embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendants, in their individual capacities, in an amount sufficient to punish them and to deter others from like conduct.

69. The unreasonable seizure of Plaintiff was the direct and proximate cause of her bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, and shock. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

### Claim 3: First Amendment — Unlawful Retaliation Against Speech — Individual Liability
### (*Bivens* Action)

70. As described above, Defendants targeted Plaintiff for arrest not because they had probable cause, but because they wanted to sow terror and suppress protected speech rights.

71. The First Amendment protects persons from unlawful curtailment of expressive conduct, assembly, and associations with one another.

72. Defendants' retaliatory motive was the but-for cause of Plaintiff's injuries. By unlawfully abducting and detaining Plaintiff, Defendants chilled Plaintiff's political speech, violating her First Amendment rights.

73. This retaliation was the direct and proximate cause of Plaintiff's bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, and shock. Ms. Ahern is entitled to all of her damages in an amount to be ascertained according to proof at trial.

## JURY DEMAND

74. Plaintiffs demand a trial by jury for all matters triable by a jury.

WHEREFORE Plaintiffs pray for judgment against Defendants individually and jointly as follows:

1. For compensatory non-economic and economic damages in an amount to be determined by a jury and for prejudgment interest on said sums;

2. For punitive damages;

3. For Plaintiffs' costs and disbursements; and

4. For such other and further relief as the Court may deem just and equitable.

DATED this 20th day of May 2022.

Respectfully submitted,

*/s/ Juan C. Chavez*
**Juan C. Chavez**, OSB #136428
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*